217-0278, Michael Dorris on behalf of Officer Harmon. Officer Harmon suffered a disabling injury in a work accident of August 23rd of 2008. Officer Harmon asks this court to reinstate the arbitrator's finding that his current condition of ill-being is related to the August 23rd, 2008 accident. We ask that the arbitrator's finding that Officer Harmon is entitled to $40,000 in medical expenses be reinstated with the corresponding credit of Old Harmless. Officer Harmon asks that he awarded TPD benefits issued from August 24th of 2008 to November 30th, 2008 and again from April 9th of 2009 through October 13th of 2014. And we seek reinstatement of the arbitrator's permanent total disability finding with benefits beginning October 14th of 2014. We also request penalties under Section 19-0 of $10,000. Essentially in this case... Are you asking for fees under 16 or not? No, I had to throw in the towel at one point. I thought it was enough issues that were occupying the time, so I limited my relief under 19-0. The Commission's decision effectively ignores long-standing principles governing aggravation of a pre-existing condition. This court is well aware that employers take employees as they find them, and if a work accident aggravates or accelerates the pre-existing condition, a causal connection exists. It really doesn't happen that the injured worker is more susceptible to an aggravation because of this pre-existing condition. So in this case, the Commission found that the work accident caused a C-3-4 disc herniation, but then it denied recovery, claiming that this condition required a treatment after March 14th of 2012 as a result of a pre-existing degenerative condition and not a work accident. This is simply erroneous. The work injury. Officer Harvin was knocked to the ground by a 100-pound weight on August 23rd, 2008. He immediately resumes medical care. Now, he had been working full-time for some three months after he had recovered from the effects of an earlier work accident that had required surgery to his C-4-5 and C-5-6 level. It was agreed that the August 23rd, 2008 work accident caused a new condition, a large disc herniation at C-3-4, and that this injury necessitated the surgery that Dr. Brader performed on April 9th of 2009. That was surgery to the C-3-4 level and also a re-exploration of the C-4-5 and C-6 level. Now, regrettably, Officer Harvin had a relatively horrific post-mortem recovery. He spent three months being fed with a tube inserted beneath his stomach. He developed persistent difficulty swallowing where he had to treat with a speech therapist and an ENT. And then he developed undermated and worsening pain, not only in his neck, but his left upper extremity. And for the next six odd years, he undergoes a series of MRI scans of his neck, x-rays and EMG study. He has injections, he has pain management, and then his long-term use of not only narcotic medication norco, but also analgesic medication. What's critical to this court's analysis is to note that Officer Harvin was never quiescent. He was never asymptomatic. He was never symptom-free after this August 23rd, 2008 injury. Let's take that one issue at a time. You contested the commission's finding he reached MMI as of March 12th, 2012, correct? I did. Okay. And you've got opinions of Brayton in your favor and Dr. Zelbe who obviously had an opposite opinion, correct? Yes. And the commission, it decided to go with Zelbe. So tell us why that was wrong. As to the MMI, first and foremost, they found MMI as of March of 2012. We've got a stipulation that TTD runs through March 23rd, 2012, so I take exception to that finding on that issue. And then second, so the commission's finding is essentially that the symptoms and the conditions for which Mr. Harvin saw medical care before March of 2012 are related to the August 23rd, 2008 work accident. In November of 2011, Dr. Brayton states that this gentleman would benefit from a third surgery to the agreed C-3-4 level and the C-4, C-5, C-5-6, and now the C-6-7 level. And he maintains that that condition is necessitated by the August 23rd, 2008 injury. Now, if a condition existed before March of 2012 that's related to the work injury, why is it no longer related because the surgery was performed thereafter? There wasn't really any change in the condition that required surgery in November of 2011. Was there some alleged intervening accident in this case? Yeah, that's the next thing. So the commission says, well, Zelbe says the surgery performed in 2013 was due in March part to playing online chess. My client, Officer Harvin, testified he never injured his neck playing online chess. He played it infrequently. And then in November of 2012, Brayton tells Officer Harvin, he stresses to him that you need this third surgery, the one I recommended a year earlier in November of 2011. So he rolls him up with more diagnostic studies in November of 2012. These MRI scans of the neck, he reiterates the same surgical recommendation. Officer Harvin goes to the ER in late December of 2012. And he testifies, he goes, my symptoms are worse. I played some online chess. I laid up and I got down. Wait a minute. Nobody, who would dispute playing online chess would have anything to do with anything? I thought there was the allegation that had surfaced that he was playing it and he jumped off a chair or got up or did something. Well, there's an allegation that he got up. He denied that, that Dr. Amada had a history that he was playing online chess and he got up out of his chair suddenly and he had pain. It was, so we've got several histories. Well, it was a physical movement. Is anybody going to elect to sit in there playing online chess is going to cause any kind of a problem? Well, that's what Dr. Zellwey tells us. Dr. Zellwey says to us, well, this third surgery. Dr. Zellwey says to us, he goes, here, this 9, 10, 13 surgery is not necessarily the result of the officer's 23rd accident. The petition itself ascribes increased neck pain to playing online chess. It's clear that's why we brought him back to treatment. Well, where did this evidence come from that he did something getting out of a chair? Dr. Amada is his personal care physician and he saw treatment with her in January of 2013. This is in reference to the online chess. So that was in the record, obviously, the medical records. It was. It was in the records of Dr. Amada. But those activities, they don't constitute a superseding intervening accident. You've got to have an episode that clearly breaks the causal chain between the work injury and the current condition. That's not here. We've got a recommendation. Did Zellwey opine that the chess incident broke the causal connection, that was an independent? Well, that's what the commission noted, that that was a contributing cause of this need for surgery in September of 2013. That's simply erroneous as a matter of law. There's no change in his physical condition that anybody can ascribe to this online chess. And Officer Harmon-Duncan, even though I played a few hours a month, it simply didn't cause any change in the condition. Look at the MRI taken in December of 2012 and contrast it with that that was performed in November of 2012 or even November of 2011. There's no change in the condition for which Dr. Brady ultimately performed surgery in 2013. So what you essentially have here, I'm trying to condense over 7,000 pages of medical testimony. You've got a work injury of August 23rd of 2008. It causes a large herniation of C3-4. Surgery is performed and the respondent agrees they have liability for. And it's not only C3-4 but C4-5 and C5-6. My client never gets better. He remains asymptomatic. Dr. Brady recommends surgery in November of 2011. He's had some horrific post-operative results from the two surgeries. He said he'd like to avoid it. And this comes up again in November of 2012. He says, I stress the importance of you contemplating this surgery. And he ultimately has had surgery in September of 2013. He denies having entered any intervening accident occurring between November of 2012 and the ultimate surgery. And the surgery performed in September of 2013 is just as Dr. Brady laid out in November of 2011. So if the condition requiring the surgery performed in September of 2013 predated his commissioned MRI finding of March 12th, it's got to be more related. It's consistent with the case law regarding an aggravation of a preexisting condition. Dr. Brady was asked to evaluate or address the issue of causation. And this is where things got a little bit snarky, if you will. He was asked to make certain assumptions in a hypothetical. And in response to that, he said, I think taking excerpts out of the history, that is true. I cannot say that the history giving me, I cannot correlate with the September 10th, 2013 surgery. I would agree with that statement. But I can't accept one piece of data and correlate with those two things. So I revisited his causal connection opinion on redirect examination. And he was crystal clear as to why the surgery was necessary. He said, look, I've got six years of MRI findings to look at. The first one I saw in 2008 showed very mild spondylitic changes. Pretty impressive for a 68-year-old guy. And it never disabled him from working. He has an earlier work injury. I do surgery. Full recovery. He then has this August 23rd, 2008 injury. And I'm taking the films. I've got five films thereafter. I can progressively see that there's a change at the level. He says the culprit to all these symptoms is the condition that's clearly more related by stipulation, the C3-C4 disc herniation. He says that's the culprit. Because I did three surgeries to this gentleman's back. I saw that the vertebral binds in each surgery. I can state categorically with 100% certainty that this is a traumatically induced spondylitic condition. And it's that traumatically induced condition that caused some of the complaints they had to be surgically addressed. If it was a non-traumatically induced spondylitic condition, I would have addressed it at the time of the first surgery. It wasn't there. It progressed over time. And he calls it a luxury of looking at these individual studies. So on the causal connection issue, it's clear that we had a work-related injury. My client never got better. And the doctor clearly related the need for the third surgery to the effects of that work accident. And the underlying stress just doesn't meet the definition of an intervening accident. In order to constitute an intervening cause sufficient to break the causal connection, does it have to change the medical condition or simply can it result in increased symptoms? I think it needs to cause a change because we've had other cases. You know, the Volvo case comes to mind. I mean, the claimant had increased symptoms after the intervening vehicular accident, but a causal connection was still found to exist because the condition predating the alleged intervening accident remained unchanged. And that's what we have here. This underlying stress is really a red herring. It had nothing to do with the need for surgery that was originally recommended in November of 2011. And I know you've addressed this, but I want to be crystal clear on this. Is there anything in the record, in the way of a medical opinion, that indicates that the condition in the claimant's cervical spine changed as a result of the chest incident? I don't have that opinion. I asked Dr. Brayden to give me an opinion on redirect examination, and he said that the online chest did not have any effect on the cervical condition for Mr. Harmon that required surgery and medical care. He saw it as an accident. Well, so let me ask you this. While you're talking about Dr. Brayden, did he admit that the claimant's cervical condition progressed from 2008 to 2013 without any trauma, and did he admit that he could not state within a reasonable degree of medical and surgical certainty that the claimant's August 23rd 2008 work accident was a factor in his need for the September 13th surgery? Did he say that he could not make that opinion? And if so, what do you make of that? To the first point, he said that there was no intervening accident is what he's getting at. It wasn't a non-work-related traumatic event that occurred from the time of the August 2008 work accident up until the time he rendered, he performed that third surgery. So as to the finding by the commission, that's what I was referencing. He was asked to assume that the March 18, 2009 MRI scan did not show disc herniation, and that's what he says. He goes, when you take that out, yeah, I can't relate to that. But then he goes on to explain his position on that. It did exist, and it is critical to his opinion on causation. I want to get to my point here. I asked him, and this is on redirect, so the surgery that he performed on September 10, 2013, would that have been performed in the absence of a work injury in December of 2006 and then on August 23rd 2008? No. I said, why is that? He goes, because this patient had severe injuries. He had repetitive injuries at work that not only caused a severe spinal cord compression that we seldom see people actually recover from, but we had a number of MRI scans that showed mild changes, and then we were ramped up. I think, with all due respect, I think you're skirting the issue. You've been alleging and honing in on the point that the surgery that was performed on September 10, 2013, was related to the August 23, 2008 work accident, but Wrayton said he couldn't state that that was the knee was related back to his August 23, 2008 injury. So how does that opinion help him? He understated that. If you assume that that injury did not cause the disc herniation at C3-4, the C3-4 disc herniation is the linchpin, if you will, to his causation finding. He tells us, he said, here's what's up. I wanted to keep going here about his causation opinion. I was addressing this on redirect exam, page 5468. He goes, there's no question in my mind, from 100% accuracy, clearly within a reasonable degree of medical surgical certainty, that this patient's care and surgical treatment, including the September 2013 operation, was necessitated by the injuries. He goes on to state, the degree of spondylotic change he has is very minor for his age and occupation. It becomes dramatic after the injury. There is a qualitative progression of the degree of spondylosis. The spondylosis is not the culprit at the beginning. It's the disc injury. The spondylosis only becomes symptomatic and accelerated over the next five years. Spondylosis can independently cause spinal cord compression to the point that you need surgery, but that didn't happen in this case. We have an MRI that documents dramatic progression in the disc herniation to the point of cord compression at C3-4. The dramatic change doesn't correlate with segment failure. It fits with a re-injury to the adjacent level. So that's corrected surgically. He then goes on to explain, degenerative disc disease is accelerated so much by these injuries that it itself becomes symptomatic. Your time has gone beyond. You'll have time in reply. Okay. Counsel, you may respond. May it please the Court. Counsel. John Fasola of the Power and Promotion on behalf of the Employer of King County Fourth Reserve District. I know you're not used to hearing this all day every day, but this case really breaks down as a classic example of a manifest weight issue. We have a decision from the commission that's based on the evaluation of the facts and the inferences that are raised from them. We have a question explicitly of the weight that's to be afforded to the opinions of opposing medical experts. The commission did weigh in on this. The decision reached by the commission is obviously entitled to deference on review, and unless the opposite conclusion is clearly apparent, this is not a decision that on the manifest weight standard should be reversed. Well, did the commission find an intervening, the chest incident to be an intervening cause sufficient to break the causal connection? I think that's overstated, quite frankly, and I know that was really argued quite vigorously in claims brief, for example. But if you look at what the commission said with respect to the chest incident and make a couple of references to it, they do say that it was clear that that's what brought him back to treatment in 2012, and I don't think that's disputable. He went to the physician, I think the emergency room actually, in December 2012, giving a specific report of feeling neck pain while playing an online chess and getting him from a chair. Well, it states at page, well, it's page 24 of the appellant's appendix here. It says the commission finds Petitioner's December 2012 hospitalization following his chest running incident was not causally related to his work after. The need for that treatment and four-day hospital stay arose suddenly following an intervening event. And I'm just trying to figure out if by that statement they found an intervening event  I don't think the conclusions and findings are ultimately based on a contention that there was an intervening accident, so to speak, that broke the chain of causation. What they're saying is that there was hospitalization and treatment that was triggered by that event, which is consistent with what I think the underlying theory is and what certainly the theory of Dr. Selby was, is that this man has a degenerative disc disease condition, irrespective of the fact that he also had a traumatically induced C3-4 herniation. That need not be related to this workplace accident. But now we've got a condition that's developed three levels lower that Dr. Selby believes is consistent with a degenerative process and is not consistent with a traumatic event having occurred three, four, even five years prior. So I think they're referencing that chest plant incident as being something that brought him to treatment in 2012, which, again, is indisputably true. I don't think they're arguing that it's necessarily, quote, unquote, an intervening accident that somehow breaks the chain of causation. The problem with causation is that there's an opinion from Dr. Selby and also in some respects from Dr. Braden that his condition of ill-being that he ultimately undergoes surgery for is related to something that could be a degenerative process and development of spondylosis that's not specifically related to the workplace accident. Can you answer the question I asked the proposing counsel? Did Dr. Braden ever state within a reasonable degree of medical certainty that the claimant's August 23, 2008 work accident was a factor in his need for the September 2013 surgery? Did he say that? Did he say that the workplace accident was a factor in the 2013 surgery? He says that at times, but he says the opposite at other times. And that's specifically what the commission looked at when they evaluated Dr. Braden's opinion is that depending on who was asking the questions, he gave different opinions. He gives an opinion as to work capabilities on direct and then he gives an opposite opinion as to work capabilities on cross. So he was a little hypocritical, to be fair to say, in his question. Yes, I think in some respects. I'm not trying to minimize the doctor, but he's a bit of a weatherman. Depending on which way the wind is blowing from who's asking questions, he's giving different opinions. And that's obviously an issue that the commission's looking at when they're trying to determine how much weight do we give to this doctor? How much weight do we give to him as compared to Dr. Zellweger who gave a more clear cut definitive opinion? If he's giving different opinions based on whether it's direct or cross or redirect, how much credence can we give to those opinions? That's the classic type of issue that the commission is specifically charged to look at when making a determination and looking at the competing opinions of two respective experts. So that's a significant factor. I mean, the commission is making the decision in part based on an evaluation of two experts in the medical field, Dr. Braden and Dr. Zellweger. They're looking in some respects at the competing opinions of two vocational experts, Mr. Rosati and Mr. Belmonte. These are the types of issues that per statute the commission is designed to look at and to make determinations on. This is the classic promise of the commission is to weigh the competing opinions of respective experts. That's what they did in this case. They looked at the opinions of the respective experts. They made a determination based on that. There's clearly foundation in the record. I believe in the prior arguments, I hate to quote Justice Hoffman, but he said as long as there's competent evidence in the record, we must affirm the decision. There's competent evidence here. If you were to review it independently, you may or may not come to the same conclusion, but there's certainly competent evidence in the record to support the findings of the commission in this case. And for that reason, the commission's decision should be affirmed. Thank you. Thank you, Counsel. Counsel, your reply. Thank you, Counsel. There really is incompetent evidence in the record. Dr. Zellwey's opinion essentially is somewhat consistent with Dr. Brighton's. He agrees that the August 23, 2008 work injury causes the C3-4 herniation. He agrees that Mr. Officer Harmon was symptomatic since that April 9, 2009 surgery, and he agrees that the surgery performed in September of 2013 was recommended in 2011. He even agrees that the surgery that was performed on April 9th of 2009 was cause and related. The condition for which my client sought medical care after March of 2012 is called a continuation of that condition for which he initially sought medical care on April 9th of 2009. And when you get into competent evidence, Dr. Zellwey didn't look at all the films. Dr. Brighton's the only physician who looked at every MRI film, six of them taken over the years. He's the one doctor that inspected this patient's neck on three separate occasions. Some other men. He eyeballed vertebral bodies. He can spot non-traumatically induced and traumatically induced spondylitic changes, and he did. He was crystal clear on that and testified with 100 percent certainty. So there is incompetent evidence to support the commission's decision on causation. If my hour went over, there were other issues in my brief that I wanted to address, and critical is the stipulation on TTD. I mean, we've got a request for hearing form filled out where a respondent is stipulated to 169 weeks of TTD. That's a binding admission on the parties. I'm going to rely on that stipulation as I tamper my client's testimony. I am certainly not going to necessarily offer evidence to establish a right to TTD during a period of time where my opponent has not only stipulated to the period but paid it. What's the effect of that? They paid 169 weeks of TTD. It's $107,000. The commission says, well, there's no stipulation on that. As a matter of fact, we're going to reduce your TTD claim to $31,000. In theory, my client is going to be compelled to repay a TTD overpayment of $75,000 on a dispute that nobody knew existed. I mean, if we knew that issue was a dispute, counsel would have addressed that when we started this case. We did opening statements. Counsel pointed out that the fight here is, is it a per total or is it a man-as-a-whole? No one ever questioned the TTD stipulation, nor was it ever rescinded. So at a minimum, at a minimum, that TTD stipulation on the request for hearing form has to be binding on the parties. And this is Marcus and Queensborough rules. We've got to know what's in dispute and what isn't going in, and that's how you tailor these disputes and have an expedited hearing. I can't expect to offer evidence on an issue that I know my opponent stipulated to. You know, why should I? I mean, it happens in this case when you look at the medical and as the evidence came in, it shows that he hadn't achieved MMI when the industrial commission claimed he did. It's, you know, that's probably the second most misunderstood three-letter word in the English language. But when you apply the MMI standard, return to work, the prognosis, and stability, it's clear that Officer Harmon's condition had not reached MMI as of December of 2009. That date cannot serve as the termination of the TTD date. When the respondent stipulated the TTD runs until May 23rd of 2012. I think I can stand on my issue on the per total and the penalties and the amount of equity. Okay, very good. Thank you, counsel, both for your arguments in this matter. We will take an advisement that this position shall issue.